**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

INNOSPEC INC. AND INNOSPEC FUEL SPECIALTIES LLC,

Plaintiffs,

v.

AURORIUM HOLDINGS LLC,

Defendant.

**C.A. No. ______________**

**JURY TRIAL DEMANDED**

# VERIFIED COMPLAINT

Innospec Inc., and Innospec Fuel Specialties LLC (collectively "Innospec"), by and through their undersigned counsel, bring this Verified Complaint against Defendant Aurorium Holdings LLC ("Aurorium"), request a trial by jury on all issues so triable, and allege as follows:

## INTRODUCTION AND SUMMARY OF THE PARTIES' DISPUTE

1. Plaintiff Innospec is a pioneer in the technology of lubricity improvers, a category of specialty chemical additives for fuels. This litigation arises from defendant Aurorium's attempt to misappropriate Innospec's trade secrets and to compete unfairly with Innospec by making false claims to the market about the lubricity improver that Aurorium is manufacturing using Innospec's trade secrets.

2. Innospec made a substantial research and development investment to devise a combination of trade secret processes for manufacturing a proprietary and highly profitable lubricity improver marketed by Innospec as OLI 9000 (collectively, the "Trade Secret Processes"). Innospec's manufacturing processes for OLI 9000 required significant research, resources, time, and effort, drawing upon Innospec's extensive prior experience and know-how. The specific details of these manufacturing processes and their combination are highly valuable trade secrets.

3. Defendant Aurorium is a manufacturer of various chemical products, including lubricants. Aurorium is the successor to a manufacturer that Innospec approached to manufacture OLI 9000 for Innospec under a series of supply agreements and related confidentiality agreements and several successive amendments of both.

4. Until the events giving rise to this dispute, Aurorium was manufacturing OLI 9000 for Innospec under a 2020 Supply Agreement (as amended, the "2020 Supply Agreement") and a 2020 Confidentiality Agreement (as amended, the "2020 Confidentiality Agreement").[1]

5. Innospec approached Aurorium to manufacture OLI 9000 because Aurorium had general experience and the necessary infrastructure to manufacture precursor products used for different *lubricant* applications. A lubricant is a substance applied between two surfaces in relative motion to reduce friction and wear. By contrast, a lubricity improver is a specific type of additive that is used to enhance the lubricating properties of a fluid, typically a fuel or a base oil. Lubricity improvers are often used when the base fluid lacks adequate lubricating ability, such as low-sulfur diesel fuels or certain synthetic oils.

6. When Innospec began discussions with Aurorium about entering into a commercial relationship, those discussions confirmed that, notwithstanding Aurorium's experience in the *lubricant* industry, Aurorium lacked the know-how to manufacture the lubricity improver OLI 9000 to Innospec's specifications on a commercial scale. Bringing the production on-line required extensive time and effort provided by Innospec's technical specialists. All of this work and communications proceeded under multiple successive confidentiality agreements and amendments.

---

[1] Aurorium and its predecessors under the several prior supply agreements and confidentiality agreements are referred to collectively as "Aurorium."

7. Among other protections, Innospec negotiated for and received Aurorium's assurance that access to Innospec's Trade Secret Processes would be limited on a "need to know" basis only to certain specific individuals who were identified by name in the confidentiality agreements and amendments thereto. Innospec further protected its product by entering into confidentiality agreements with its customers that, among other provisions, prohibited reverse engineering or similar efforts to extract Innospec's trade secrets. And Innospec's own employees with access to the Trade Secret Processes are subject to confidentiality agreements and are required to use appropriate technological and physical safeguards to preserve secrecy.

8. Because Innospec's products manufactured using Innospec's Trade Secret Processes are superior to the products of competitors who lack knowledge of the Trade Secret Processes, Innospec has gained a strong market advantage and reputation.

9. Innospec received a sample of Aurorium's lubricity improver in early 2024. Chemical analysis subsequently revealed that Aurorium's lubricity improver – offered for sale by Aurorium as Texalene 7467 -- was substantially identical in molecular structure to Innospec's product. Innospec believed and believes that producing a product with this particular molecular structure on a commercial scale necessarily would require Aurorium to use and rely on the same Trade Secret Processes that Innospec taught Aurorium under the terms of the parties' confidentiality agreements.

10. In an attempt to resolve this matter amicably, Innospec contacted Aurorium and sought information and assurances. Aurorium refused to provide any more than the vaguest and most conclusory generalities. Defendant refused to identify the personnel involved in developing or manufacturing Texalene 7467 and whether any of them also ever had access to Innospec's Trade Secret Processes. Accordingly, Innospec demanded return of its confidential information pursuant

to the 2020 Confidentiality Agreement and terminated the parties' 2020 Supply Agreement for material breach.

11. Upon further investigation, Innospec discovered that Aurorium falsely claimed to have regulatory approval in the United States for its competing lubricity improver. That is, by falsely contending in its Safety Data Sheet ("SDS") that its product is exempt from certain United States Environmental Protection Agency ("EPA") regulations under the Toxic Substances Control Act ("TSCA"), Aurorium would be able to sell its product without the submission of a Pre-Manufacture Notice ("PMN") to EPA at least 90 days prior to manufacturing for commercial purposes.

12. Aurorium is offering Texalene 7467 for commercial sale through its website, and on information and belief, otherwise, directly to customers and potential customers in the United States even though it lacks sufficient regulatory approval. Aurorium's SDS for Texalene 7467 misrepresents that Texalene 7467 is ready for commercial sale without the prior submission of a PMN to the EPA.

13. Aurorium apparently is relying on a limited regulatory exemption for certain polymers, but analysis of Texalene 7467 shows that it does not meet the requirements for this exemption. By falsely holding out Texalene 7467 as meeting EPA regulatory requirements, Aurorium is gaining a further unfair competitive advantage over Innospec, whose OLI 9000 actually has full regulatory approval through an arduous and time-consuming PMN process.

14. In 2006, Innospec received the EPA's prestigious P2 award for pollution prevention. A then newly innovated product, OLI 9000.m, was recognized for reducing source emissions from vehicles by enabling the use of Ultra-Low Sulfur Diesel fuel. This reduced sulfur level directly reduced particulate levels and protected emission control devices.

15. An SDS provides detailed information about a chemical substance or mixture, including its properties, hazards, handling, storage, and emergency measures. SDSs are required for selling chemicals in the United States. The Occupational Safety and Health Administration ("OSHA") mandates the use of SDSs under the Hazard Communication Standard ("HCS") (29 CFR 1910.1200), which is designed to ensure that information about chemical hazards and associated protective measures is disseminated to workers and employers.

16. SDSs are indispensable tools in the chemicals industry, ensuring safety, compliance, and environmental protection. They provide comprehensive information necessary for the safe management of chemical products manufactured and distributed for commercial purposes.

17. Based on typical industry practice, the SDS is a significant part of how a manufacturer markets and promotes its products, because the information provided is essential for the purchaser to appropriately handle the product it is considering purchasing. SDSs are routinely part of the presentation that a potential purchaser receives in the initial product pitch. Moreover, the SDS regulatory information as to Aurorium's product indicates that Aurorium does not require regulatory approval to manufacture and sell to customers.

18. Innospec made a significant investment of time and resources to receive EPA's required regulatory approval to manufacture its products by preparing and submitting a PMN.

19. Defendant is engaging in unfair competition by misrepresenting that its product does not require such regulatory approval.

20. In addition, Aurorium's marketing of the competing product without the required regulatory approval creates risk of harm to Innospec's approved product because customer confusion may in error associate Innospec's safe product with Aurorium's unapproved product.

21. Innospec respectfully brings this action based on the information it possesses and the inferences supported by Aurorium's refusal to disclose how and by whom its competing lubricity improver were developed or to explain how Aurorium could have reached a commercial scale of production without relying directly or derivatively upon Innospec's Trade Secret Processes, and Aurorium's refusal to provide any assurances that the personnel who were exposed to Innospec's Trade Secret Processes were not also involved in Aurorium's development of a substantially similar competing product that uses a compound with the same chemical structure as Innospec's product.

22. Accordingly, Innospec brings this action for breach of the 2020 Supply Agreement and 2020 Confidentiality Agreement, for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.*, and for false advertising and unfair competition under the federal Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531 *et. seq*.

## **THE PARTIES**

23. Innospec Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 8310 South Valley Highway, Suite 350, Englewood, Colorado 80112.

24. Innospec Fuel Specialties, LLC is a limited liability company organized under the laws of Delaware. Innospec Fuel Specialties, LLC is a subsidiary of Innospec Inc., with its principal place of business located at 200 Executive Drive, Newark, DE 19702

25. Innospec is a global specialty chemistry company with manufacturing plants, research centers and additional facilities in twenty-two countries. Innospec provides chemicals, additives, and formulations for many different markets, including agrochemicals, construction, fuel, home care, metal extraction, oilfield, personal care, polymers and waxes.

26. Innospec has a laboratory facility in Delaware at 200 Executive Drive, Newark, DE 19702, and has done business on an extensive and continuous basis in the State of Delaware for many years.

27. In 1994, Innospec's predecessor Octel acquired E.I du Pont's petroleum additives business. In 1995, the business moved from New Jersey to Newark, Delaware and then expanded its scientific research activities at its Delaware operations in 1999. What started then as an under $100 million per year petroleum additives division largely in North America is now an almost $1.8 billion per year global business selling and manufacturing performance products for agricultural, construction, personal care, household, industrial and oilfield markets.

28. In 2008, Innospec again substantially expanded its laboratory operations in Delaware, and the Delaware State Development Office awarded Innospec with an $80,000 grant to support Innospec's research into renewable fuels. Innospec again expanded its facilities in 2022 due to growing research into future fuels.

29. Defendant Aurorium Holdings LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at 201 N. Illinois St., Ste. 1800, Indianapolis, Indiana 46204.

30. Through a series of corporate acquisitions and restructurings, Aurorium is the successor in interest to entities that have manufactured products for Innospec for over two decades. Aurorium previously did business as Vertellus. Vertellus acquired Bercen Chemicals LLC in 2020, and Vertellus acquired Pentagon Chemicals in 2014. All of these entities are herein referred to as "Aurorium," unless otherwise indicated. Innospec has had contract or toll manufacturing agreements and confidentiality agreements with each of these predecessor companies.

31. Aurorium manufactures specialty ingredients and performance-enhancing materials, including as a contract or toll manufacturing company, to provide innovator companies such as Innospec with chemical products pursuant to confidential and proprietary specifications supplied by Innospec to Aurorium.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), and 15 U.S.C. §§ 1116 and 1121, as this case arises under the Defend Trade Secrets Act and the Lanham Act.

33. This Court has supplemental jurisdiction over Innospec's state-law claims against Aurorium pursuant to 28 U.S.C. § 1367(a), because these claims are so related to Innospec's claim under the Defend Trade Secrets Act and the Lanham Act that they form part of the same case or controversy.

34. Aurorium is subject to the personal jurisdiction of this Court because Aurorium consented to personal jurisdiction and venue under the 2020 Supply Agreement and the 2020 Confidentiality Agreements, the two contracts in suit. In addition, Aurorium is organized under the laws of the State of Delaware.

35. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## THE FACTUAL BASIS FOR THE CLAIMS

### A. Innospec's Lubricity Improver Technology

36. A lubricity improver is an additive used in fuels to enhance their lubricating properties. The primary purpose of these additives is to reduce wear and tear on engine components, such as fuel pumps and injectors, which can be adversely affected by low-lubricity fuels. An important application for lubricity improvers is diesel fuels. Environmental concerns have led to regulatory requirements to reduce the sulfur content of diesel fuels. The processes

employed to reduce sulfur levels also remove naturally occurring lubricity agents in diesel fuel and so limit the fuel's ability to lubricate and protect the various parts of the engine's fuel injection system from wear. Lubricity improvers address this issue, allowing cleaner burning fuels without compromising engine performance.

37. Innospec is recognized as the market leader for high quality lubricity improvers in extensively regulated aviation fuels and modern sulfur-regulated diesel fuels. Innospec's reputation in the industry for innovation and premium-quality fuel additives including lubricity improvers is second to none, and its products have won awards and are used by the largest fuel companies in the world.

**B. Aurorium's Manufacture of OLI 9000 for Innospec**

38. Innospec and Aurorium and Aurorium's predecessors entered into a series of manufacturing and supply agreements and related confidentiality agreements dating back over two decades for fuel additive products.

39. In October 2014, Innospec and Aurorium entered into a Toll Manufacturing and Blending Agreement for various fuel additives (the "2014 Toll Manufacturing Agreement"). Thereafter in June 2019 the parties entered into an amendment to the 2014 Toll Manufacturing Agreement, which provided that the Innospec product OLI 9000 was to be manufactured by Aurorium for Innospec, pursuant to specifications supplied by Innospec in a Schedule B to that amendment. Schedule B contains extensive confidential and proprietary information and is labeled "Confidential." **Exhibit A**, filed under seal, is a true and accurate copy of the Schedule B of the 2019 amendment to the 2014 Toll Manufacturing Agreement.

40. In March 2020, Innospec and Aurorium agreed to a further amendment to the 2014 Toll Manufacturing and Blending Agreement, which contained further supply commitments for the supply of variant OLI 9000.m by Aurorium to Innospec.

41. In May 2020, Innospec and Aurorium entered into a Confidentiality Agreement (the "2020 Confidentiality Agreement"), which superseded all prior confidentiality agreements, covered all confidential information previously disclosed by Innospec under the prior confidentiality agreements, and designated Delaware law as the applicable law and Delaware courts as the forum for any dispute. A true and accurate copy of the 2020 Confidentiality Agreement is attached as **Exhibit B**, filed under seal.

42. In a first amendment in November 2020 to the 2020 Confidentiality Agreement, Innospec and Aurorium identified specific Aurorium personnel authorized to have access to Innospec's confidential information under the 2020 Confidentiality Agreement. A true and accurate copy of that amendment is attached as **Exhibit C**, filed under seal.

43. In a second amendment in December 2021 to the 2020 Confidentiality Agreement, Innospec and Aurorium further agreed as the terms of confidentiality that "For avoidance of doubt, Receiving Party [i.e., Aurorium] shall at no time disclose use for its own benefit or for the benefit of a 3rd party, any of Disclosing Party's [i.e., Innospec's] Confidential Information. For example, Receiving Party is explicitly prohibited from using Disclosing Party's Confidential Information to manufacture product for itself or a 3rd party." The second amendment to the 2020 Confidentiality Agreement extended the term to 2025. A true and accurate copy of that second amendment is attached as **Exhibit D**, filed under seal.

44. In a third amendment to the 2020 Confidentiality Agreement, entered into by Innospec and Aurorium in January 2024, Exhibit A thereto provided a list of personnel authorized to have access to Innospec's confidential information under the 2020 Confidentiality Agreement. The third amendment to the 2020 Confidentiality Agreement extended the term to 2029. A true

and accurate copy of that amendment, including its Exhibit A, is attached as **Exhibit E**, filed under seal.

45. In December 2020, Innospec and Aurorium had entered into a Supply Agreement relating to the manufacture and supply of OLI 9000 (as defined above, the "2020 Supply Agreement"). The 2020 Supply Agreement explicitly references the confidentiality provisions of the 2020 Confidentiality Agreement: "Notwithstanding anything else in this agreement to the contrary, this agreement shall not supersede or replace the obligation set forth in the confidentiality agreement between the parties effective May 6th, 2020." A true and accurate copy of the 2020 Supply Agreement is attached as **Exhibit F**, filed under seal.

46. The 2020 Supply Agreement provides that Aurorium shall maintain a list of all persons given access to Innospec's "Intellectual Property" for the Product and shall provide the list at Innospec's request (section 2.2).

47. The 2020 Supply Agreement supersedes prior agreements, allows for termination for substantial breach not cured or curable, and contains a forum selection clause and governing law for Delaware, consistent with the 2020 Confidentiality Agreement.

48. Appendix 4 to the 2020 Supply Agreement states "On or about October 16th, 2020, Innospec provided to [Aurorium] the process for manufacturing OLI 9000 M (the "Process") to Innospec's Specifications."

49. When teaching Aurorium the OLI 9000 process, which substantially exceeded and enhanced standard chemical formulation practices, Innospec's scientists and chemical engineers had extensive discussions and engagement with Aurorium in order to teach Aurorium the Trade Secret Processes.

**C. Innospec's Trade Secret Processes for Manufacturing OLI 9000**

50. Innospec creates and maintains significant confidential, proprietary, and trade secret information concerning its technology, including the Trade Secret Processes. That information has value to Innospec by virtue of its confidentiality and because information is not known to those who compete or seek to compete with Innospec, and Innospec has taken significant steps to protect the confidentiality of that information.

51. Innospec takes extensive steps with employees, consultants and third parties to prevent inadvertent or improper disclosure of the Trade Secret Processes, including through confidentiality provisions in agreements and other precautions to protect its confidential and proprietary information.

52. Innospec has also taken extensive measures to prevent inadvertent or improper disclosure of the Trade Secret Processes, including through physical security, electronic and data security, and personnel policies and restrictions.

53. On information and belief, prior to Aurorium's involvement as a toll manufacturer for Innospec and exposure to Innospec's confidential information, Aurorium was not involved in the manufacture of fuel lubricity improvers and had no knowledge of this market nor the formulations used in this market. Instead, on information and belief, Aurorium was familiar with manufacture of lubricants, which are distinct chemical additives with materially different chemical structures, compositions, and performance requirements.

54. Furthermore, Innospec's observations of Aurorium technology, personnel, expertise and facilities have led Innospec to conclude that Aurorium lacked the know-how and abilities to develop independently the processes required to produce Texalene 7467, in the laboratory or commercially at scale.

55. Attached to this Complaint as **Exhibit G**, filed under seal, is a nonexclusive list of a combination of particular key Trade Secret Processes expressly disclosed to Aurorium in "Schedule B" and otherwise. These individual processes, and the combinations and sequences thereof, comprise valuable trade secrets, which Innospec asserts, on information and belief, were substantially used and relied upon by Aurorium in connection with the development and processing in laboratory and/or for commercial scale-up of Texalene 7467, including plant operation, either directly, derivatively, or as a starting point or guide in developing the same or substantially the same product and combination of processing steps.

56. A commercial production process such as Innospec's Trade Secret Processes, consisting of a combination of the principles and details used to make a product, qualifies as a trade secret, as can specific steps or procedures within the overall process. The combination of steps or sequence in a process can be a trade secret, even if all the component steps are known, so long as some part of the combination or sequence of steps is a unique process which is not known in the industry. Innospec's Trade Secret Processes exist in a combination and sequence of characteristics and components, even if aspects can be found in the public domain, whereas the unified process, design and operation, in unique combination or sequence, affords a competitive advantage to Innospec and is a protectable secret.

57. At individual steps of Innospec's Trade Secret Processes, there are a variety of alternatives that a person skilled in the art might choose, and the choices made by Innospec, through much effort and experimentation with specific ingredients, materials, conditions, and steps in an actual, working process, constitute a trade secret.

58. Innospec's Trade Secret Processes extend not only to the misappropriated trade secret itself but also to know-how and insights substantially derived from knowledge of and

experience practicing the Trade Secret Processes, such as where the trade secret is used by Aurorium as a starting point or guide in developing a process. Whereas on information and belief Aurorium personnel responsible for developing the process for manufacturing Texalene 7467 were the same persons also familiar with Innospec's Trade Secret Processes, it is inevitable that they would rely upon and incorporate Innospec's Trade Secret Processes into the development and performance of Aurorium's manufacturing processes for Texalene 7467.

59. Aurorium's misappropriation also occurred when it used Innospec's Trade Secret Processes to understand what pitfalls to avoid. Innospec's trade secrets include negative, inconclusive, or sufficiently suggestive research data that would give a person skilled in the art a competitive advantage he or she might not otherwise enjoy but for the knowledge gleaned from Innospec's research investment.

60. Given the scope and nature of the confidential information disclosed to Aurorium over time by Innospec as to the specific composition of OLI 9000 and the Trade Secret Processes for the manufacture of OLI 9000, the very identification of the specific molecule as an exceptional lubricity improver, the substantial molecular commonalties between OLI 9000 and Texalene 7467, and other circumstantial evidence above, on information and belief, Innospec asserts that Aurorium developed Texalene 7467 by using in whole or in part Innospec's Trade Secret Processes, with the assistance of Aurorium personnel exposed to Innospec's confidential information and trade secrets under the 2020 Confidentiality Agreement, and otherwise misappropriated Innospec's trade secrets relating to the composition of OLI 9000 and the process for manufacture at scale, and/or misappropriated information substantially derived from such trade secrets, including without limitation using Innospec trade secrets and confidential information as a starting point or guide in developing its Texalene 7467 formulation.

### D. Aurorium's Wrongful Acts Giving Rise to this Suit And Innospec's Demands For Assurances

61. After many years of utilizing Innospec proprietary confidential information regarding Innospec's fuel additives and particularly the OLI 9000 product that Aurorium and its predecessors manufactured and supplied exclusively for Innospec under extensive contracts specifically designed to protect Innospec confidential information and intellectual property, Aurorium unilaterally developed and launched a competing product of substantially the same formula, Texalene 7467.

62. Aurorium currently promotes and offers for sale Texalene 7467 as a lubricity improver for fuels:



**Texalene™ 7467**

helps extend maintenance intervals and engine life which reduces the environmental impact of servicing combustion engines

- organic, ashless chemistry, neutral additive with excellent compatibility
- used in fuel to avoid excessive wear on fuel pumps and injectors
- reduces friction, while improving wear resistance
- wear performance demonstrated at lower than typical use levels

**applications**

- fuel additives

**functions**

- lubricity improver

(from https://www.aurorium.com/mobility/texalene-7467, downloaded November 24, 2024)

63. Aurorium has published a Safety Data Sheet ("SDS") for Texalene 7467, a true and accurate copy of which is attached as **Exhibit H**. The SDS identifies Texalene 7467 with the

chemical name: "2,5-Furandione, 3-(2-hexadecen-1-yl)dihydro-, polymer with 1,2-ethanediol." This corresponds to the following chemical structure:




64. Based on these circumstances and Innospec's analysis of Texalene 7467, Innospec wrote to Aurorium on September 3, 2024, requesting information regarding the development and commercialization of Texalene 7467 and asserting Innospec's rights under the 2020 Confidentiality Agreement, the 2020 Supply Agreement, and trade secret laws, *inter alia*. A true and accurate copy of that letter is attached as **Exhibit I**, filed under seal.

65. Under the circumstances, Innospec requested that Aurorium suspend further commercialization of Texalene 7467 while the dispute was addressed by the parties.

66. Innospec also requested a full accounting of the commercial status of Texalene 7467, including total sales, regulatory approval status, and any agreements or communications with third parties, customers, potential customers, or other entities regarding the manufacture, sale, distribution or blending of the same.

67. Innospec also requested Aurorium disclose all individuals or entities exposed to Innospec's confidential information and involved in Aurorium's design, development, or manufacture of Texalene 7467.

68. On September 20, 2024, counsel for Aurorium responded by letter without supplying any of the requested information or evidence, and denied any wrongdoing. A true and accurate copy of that letter is attached as **Exhibit J**, filed under seal. In conclusory terms Aurorium asserted Texalene 7467 was "developed independently of any work with the OLI 9000 product," based on "publicly available prior art records." Aurorium provided no documentation or evidence, no information about the personnel involved in OLI 9000 or Texalene 7467, no identification of purported prior art formulations, and no information on commercialization of Texalene 7467.

69. On October 1, 2024, Innospec responded by a letter (a true and accurate copy of which is attached as **Exhibit K**, filed under seal) to demand return of all Innospec confidential information under the 2020 Confidentiality Agreement, section 6, which provides:

> RETURN OF CONFIDENTIAL INFORMATION
>
> The Recipient shall, if requested by the Discloser at any time, forthwith return or destroy (at the Discloser's option) the Confidential Information or any part thereof. Where, pursuant to clause 3.1, the Recipient has passed any Confidential Information to third parties, it shall ensure that such Confidential Information is also returned or destroyed, provided that Recipient may retain a copy of the Discloser's Confidential Information in its confidential legal department's files for compliance and archival purposes. In the case of a request by the Discloser for the destruction of Confidential Information, the Recipient shall also forthwith confirm to the Discloser in writing that it has complied with such request.

70. Because return of Innospec's confidential information would make Aurorium unable to perform its obligations under the 2020 Supply Agreement, and because Aurorium used Innospec's confidential information and intellectual property outside the scope of the 2020 Supply Agreement license grant, which use is exclusively limited to Innospec's benefit, Innospec provided notice of termination of the 2020 Supply Agreement, sec. 11(i), due to substantial incurable breaches.

71. Aurorium also breached the 2020 Supply Agreement by failing to respond to Innospec's request to identify personnel exposed to Innospec's confidential information.

72. On information and belief, after unlawfully using Innospec's confidential information in breach of the 2020 Confidentiality Agreement to develop Texalene 7467, and misappropriating Innospec's Trade Secret Processes, Aurorium has sold to, or offered to sell to, or otherwise interfered with, Innospec's existing or potential customers for OLI 9000 in an effort to displace Innospec and provide Texalene 7467 instead.

73. On information and belief, Aurorium is commercializing Texalene 7467 either directly to customers and/or through intermediaries, distributors, or other third-party sales representatives.

74. On information and belief, Aurorium's Texalene 7467 has been offered to Innospec's current customers and potential customers for OLI 9000.

**E. Aurorium's False and Misleading Claims to the Market**

75. Aurorium is publishing commercial documents to the field including its SDS for Texalene 7467, which contain false and misleading information regarding regulatory approval and Aurorium's legal right to sell Texalene 7467 in the United States. On information and belief, Aurorium has made other statements of the same nature and scope through its marketing and promotion of Texalene 7467, which actually or by implication represent that Aurorium has the legal right to manufacture and sell at commercial volumes Texalene 7467 under applicable regulations.

76. The Aurorium Texalene 7467 SDS (**Exhibit H**) states a Chemical Abstracts Service Registry Number ("CAS No.") as: 2715165-73-2. This information is repeated in Section 3 of the SDS ("Composition/Information on ingredients"):

3.1. Substances

| | |
|---|---|
| Substance type | : Polymer |
| Name | : Texalene 7467 |
| CAS-No. | : 2715165-73-2 |

| Name | Product identifier | % | GHS US classification |
|---|---|---|---|
| 2,5-Furandione, 3-(2-hexadecen-1-yl)dihydro-, polymer with 1,2-ethanediol | CAS-No.: 2715165-73-2 | 96-100 | Not classified |

77. Thus, Aurorium's SDS reports Texalene 7467 to be 96-100% pure "2,5-furandione, 3-(2-hexadecen-1-yl)dihydro-, polymer with 1,2-ethanediol."

78. Section 15 of the SDS ("Regulatory information") states the following:

Commercial status of components according to the United States Environmental Protection Agency's Toxic Substances Control Act (TSCA):

| Name | CAS-No. | Listing | Commercial status | Flags |
|---|---|---|---|---|
| 2,5-Furandione, 3-(2-hexadecen-1-yl)dihydro-, polymer with 1,2-ethanediol | 2715165-73-2 | Exempted | - | |

79. Thus, the chemical ingredient in Texalene 7467 (96-100% 2,5-furandione, 3-(2-hexadecen-1-yl)dihydro-, polymer with 1,2-ethanediol) is represented in the SDS as being exempt from TSCA.

80. The CAS number of the Texalene chemical, 2715165-73-2, however, could not be found on the latest (May 20, 2024) iteration of the non-confidential business information ("CBI") version of the TSCA Inventory, indicating that it is a "new" and not an "existing" chemical substance. The receipt of a new CAS number is a formality that does not involve regulatory approval by the U.S. Environmental Protection Agency ("EPA").

81. Section 5 of TSCA requires anyone who plans to manufacture or import a new chemical substance for a non-exempt commercial purpose to submit to the EPA a Premanufacture Notice ("PMN") at least 90 days prior to importing or starting to manufacture the substance. *See* 40 CFR Part 720. Exemptions from these reporting requirements include:

- Polymers that meet the 1995 Polymer Exemption Rule Amendments (40 CFR §723.250)
- Low Volume Exemptions (LVEs) for chemical substances manufactured in quantities of not more than10,000 kg/year (40 CFR §723.50)
- Test Market Exemptions
- Substances used for research & development

82. Inasmuch as Aurorium has been commercially offering Texalene 7467 to customers and otherwise on its website and, on information and belief, through other channels, and on information and belief has been manufacturing, offering and selling commercial quantities thereof, the only exemption that could apply as referenced in the SDS is the polymer exemption.

83. In order to qualify for the polymer exemption, a chemical substance must not only meet the general definition of "polymer" at §723.250(b), but it must also meet the exemption criteria at §723.250(e), and must not be excluded by the various limitations listed under §723.250(d).

84. The exemption criteria of §723.250(e) are three in number:

(1) Polymers with number average MW greater than or equal to 1,000 and less than 10,000 Daltons (and oligomer content less than 10 percent below MW 500 and less than 25 percent below MW 1,000).
(2) Polymers with number average MW greater than or equal to 10,000 (and oligomer content less than 2 percent below MW 500 and less than 5 percent below MW 1,000).
(3) Polyester polymers [listed in a Table in the Code].

85. Exemption (3) does not apply, since one of the manufacturing components (the source of the "2,5-furandione, 3-(2-hexadecen-1-yl)dihydro-" moiety) is not listed in the §723.250(e)(3) table provided.

86. However, a sample of Texalene 7467 was tested using gel permeation chromatography (GPC), a technique designed to characterize the molecular weight distribution of a polymer, and shows the following:

29.7% below a molecular weight (MW) of 1000 Daltons
3.7% below MW of 500 Daltons

87. With an oligomer content of 3.7% below MW 500 and 29.7% below MW 1000, the sample of Texalene 7467 does not meet either of the two other exemption criteria.

88. Accordingly, Aurorium has falsely represented that Texalene 7467 qualifies for the polymer exemption under TSCA, and in so doing, falsely represents and implies that Texalene 7467 is approved for sale in the United States by the EPA.

**COUNT I**
**(Breach of 2020 Supply Agreement)**

89. Innospec realleges and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

90. Innospec and Aurorium are parties to the 2020 Supply Agreement, which is a valid and enforceable contract, and Innospec has performed its obligations under the contract.

91. Aurorium materially and substantially breached the 2020 Supply Agreement, including Aurorium's use of Innospec's intellectual property beyond the scope of the license (Section 2.1), Aurorium's failure to provide Innospec with a list of persons exposed to Innospec's confidential information (Section 2.2), and Aurorium's failure to comply with its supply obligations under the 2020 Supply Agreement, which breaches are not curable or cured by Aurorium. In addition, the 2020 Supply Agreement recognizes the obligations provided in the 2020 Confidentiality Agreement Section 9.

92. As a result of Aurorium's breach, Innospec has suffered damages in an amount to be determined at trial.

93. Innospec also seeks an Order from this Court permanently enjoining Aurorium from retaining or using Innospec's confidential information, and ordering Aurorium to deliver the same to Innospec forthwith.

**COUNT II**
**(Breach of 2020 Confidentiality Agreement)**

94. Innospec realleges and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

95. Innospec and Aurorium are parties to the 2020 Confidentiality Agreement, which is a valid and enforceable contract, and Innospec has performed its obligations under the contract.

96. Aurorium materially and substantially breached the 2020 Confidentiality Agreement, and in particular Section 4, as amended December 15, 2021, which prohibits Aurorium from using Innospec's Confidential Information to manufacture product for itself or a 3rd party.

97. As a result of Aurorium's breach, Innospec has suffered damages in an amount to be determined at trial.

98. Innospec also seeks an Order of this Court permanently enjoining Aurorium from retaining or using Innospec's confidential information, and ordering Aurorium to deliver the same to Innospec forthwith.

**COUNT III**
**(Violation of the federal Defend Trade Secrets Act)**

99. Innospec realleges and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

100. This is a cause of action for misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), based on Aurorium's misappropriation of Innospec's Trade Secret Processes through wrongful acquisition, disclosure and/or use.

101. Innospec's Trade Secret Processes comprise trade secrets because the information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person, such as a competitor,

who could obtain economic value from this disclosure or use of the information. Innospec has taken reasonable measures to keep such information secret as described in the paragraphs above. At great expense, Innospec spent substantial time, effort, and expense in research and development and testing to recognize, confirm and optimize the lubricity improvement advantages of its proprietary formulations, including laboratory testing and development of scale processing, testing in various fuels under various commercial circumstances, compatibility testing with other additives, comparison testing for competing alternative formulations, and the development and refinement of the Trade Secret Processes for manufacturing this product. Aurorium, by using knowledge of Innospec's Trade Secret Processes either to practice those same processes or similar processes derived therefrom, misappropriated the value of this Innospec work.

102. Innospec is the owner of the proprietary information at issue, as the term is defined in 18 U.S.C. § 1839(4).

103. Innospec and Aurorium executed the 2020 Supply Agreement and the 2020 Confidentiality Agreement, thereby acknowledging that Innospec owned and would disclose its proprietary OLI 9000 product and the Trade Secret Processes associated with its manufacture.

104. Innospec supplied documentary and oral confidential information to Aurorium relating to OLI 9000 under the protections of the 2020 Supply Agreement and the 2020 Confidentiality Agreement, including without limitation as disclosed in the "Schedule B" to the June 2019 amendment to the 2014 Toll Manufacturing and Blending Agreement. **See Exhibit A ("Schedule B").**

105. Over the course of the commercial manufacturing relationship under the 2020 Supply Agreement and 2020 Confidentiality Agreement (and earlier agreements) relating to the

manufacture of OLI 9000, Innospec disclosed to Aurorium documentary and oral information about the Trade Secret Processes.

106. Texalene 7467 shares numerous specification and structural commonalities with OLI 9000, including aspects that involve confidential information. Given these commonalities, Innospec alleges on information and belief that Aurorium utilized the Trade Secret Processes and also used and relied upon personnel exposed to Innospec's Trade Secret Processes provided under the protection of the 2020 Confidentiality Agreement.

107. Innospec invested significant money in developing its Trade Secret Processes.

108. It would require considerable efforts and significant expense for anyone outside Innospec to create, acquire or duplicate Innospec's Trade Secret Processes.

109. Thus, Innospec's Trade Secret Processes relating to OLI 9000 constitute trade secrets owned by Innospec under the DTSA, 18 U.S.C. § 1836(c).

110. Aurorium misappropriated Innospec's Trade Secret Processes by using them, or deriving information from them, in its process to develop and manufacture its competing product Texalene 7467, with the intent to sell to Innospec's customers and displace OLI 9000.

111. All the above conduct was done without Innospec's authority or consent.

112. On information and belief, Aurorium's unlawful misappropriations occurred substantially or in whole in the United States.

113. These acts of misappropriating Innospec's trade secrets by Aurorium were, and continue to be, willful and malicious, thus warranting an award of exemplary damages, as provided by 18 U.S.C. § 1836 (b)(3)(C), and an award of attorney fees, as provided by 18 U.S.C. § 1836 (b)(3)(D).

114. As a result of Aurorium's conduct, Innospec has suffered damages in an amount to be determined at trial.

115. If not enjoined by the Court, Aurorium will continue to misappropriate and use Innospec's trade secret information for its own benefit, causing Innospec continuing irreparable harm, damage and injury. Because Innospec's remedy at law is inadequate, Innospec seeks, in addition to damages, a permanent injunction to recover and protect its trade secret information.

**COUNT IV**
**(Violation of Delaware Uniform Trade Secrets Act)**

116. Innospec realleges and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

117. This is a cause of action for misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 *et seq*. ("DUTSA"), based on Aurorium's misappropriation of Innospec's trade secret information through wrongful acquisition, disclosure and/or use.

118. For the same reasons identified above as to Aurorium's trade secret misappropriation under the DTSA, incorporated herein, Aurorium is liable for trade secret misappropriation under the DUTSA.

119. Aurorium misappropriated Innospec's Trade Secret Processes by improperly acquiring, disclosing, using, and continuing to use them. Aurorium is misappropriating Innospec's Trade Secret Processes by using the trade secrets to compete unfairly against Innospec in the marketplace. Aurorium knew or had reason to know that Innospec's trade secrets have been acquired and used wrongfully. Aurorium's prohibited and improper acquisition, disclosure, use and continuing use of Innospec's trade secrets constitutes a violation of the DUTSA.

120. As a result of Aurorium's conduct, Innospec has suffered damages in an amount to be determined at trial.

121. If not enjoined by the Court, Aurorium will continue to misappropriate and use Innospec's trade secret information for Aurorium's own benefit, causing Innospec continuing and irreparable harm, damage and injury. Because Innospec's remedy at law is inadequate, Innospec seeks, in addition to damages, a permanent injunction to recover and protect its trade secret information.

## COUNT V
## (False Advertising Under the Lanham Act)

122. Innospec realleges and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

123. Upon information and belief, in the course of advertising and marketing Texalene 7467, Aurorium has used, in interstate commerce and in commercial advertising, false and misleading representations of fact that misrepresent the safety, environmental impact, and regulatory status of Texalene 7467.

124. These false and misleading representations include, but are not limited to, the representations that Texalene 7467 has regulatory approval with the EPA under TSCA.

125. Upon information and belief, Aurorium's representations are made to customers and potential customers.

126. Aurorium's misrepresentations about Texalene 7467 relate to the nature, characteristics, and/or qualities of Texalene 7467.

127. Aurorium's false and misleading representations are material in that they are likely to influence the purchasing decisions of customers in the fuel industry.

128. Aurorium's representations about Texalene 7467 have deceived and/or have the tendency to deceive a substantial segment of its intended audience.

129. Upon information and belief, but for Aurorium's false and misleading statements, consumers in the fuel industry would not purchase Texalene 7467.

130. Upon information and belief, Aurorium's actions have been willful and deliberate.

131. As a direct and proximate result of Aurorium's actions, Innospec has and will continue to suffer damage to its business, reputation, goodwill, and the loss of sales, profits, and customers.

132. Aurorium's actions as alleged herein have caused, are causing, and will continue to cause irreparable and inherently unquantifiable injury and harm to Innospec's business, reputation, and goodwill, unless enjoined by this Court.

133. Pursuant to 15 U.S.C. § 1116, Innospec is entitled to permanent injunctive relief to Aurorium's continuing acts.

134. Pursuant to 15 U.S.C. § 1117, Innospec is entitled to recover treble damages sustained by Aurorium's actions, an accounting for profits realized by Aurorium, and the costs of this action.

135. In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), Innospec entitled to an award of reasonable attorney's fees.

## COUNT VI
## (Unfair Competition Under the Lanham Act)

136. Innospec repeats and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

137. By virtue of Aurorium's false or misleading representations, as detailed above, Aurorium is also liable for unfair competition under the Lanham Act.

138. Aurorium's false and/or misleading representations of fact are likely to cause confusion or mistake or to deceive as to Texalene 7467's approval by the EPA.

139. Consumers may be deceived into believing that Texalene 7467 has been authorized by the EPA.

140. Innospec is likely to be and has been damaged by Aurorium's conduct, as detailed herein. Innospec is entitled to damages for Aurorium's unfair competition, an accounting of profits and recovery of Innospec's costs of this action.

141. Because Aurorium's conduct is causing irreparable and inherently unquantifiable injury and harm to Innospec's business, reputation, and goodwill, Innospec is entitled to permanent injunctive relief, enjoining Aurorium from further unfair competition, including without limitation, removing the false and misleading statements regarding Texalene 7467's regulatory status.

142. Pursuant to 15 U.S.C. § 1117, Innospec is entitled to recover treble damages sustained by Aurorium's actions, an accounting for profits realized by Aurorium, and the costs of this action.

143. In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), Innospec is entitled to an award of reasonable attorney's fees.

**COUNT VII**
**(False Advertising Under Delaware Deceptive Trade Practices Act)**

144. Innospec repeats and incorporates by reference the allegations of all preceding paragraphs of this Complaint, as if fully set forth herein.

145. By virtue of Aurorium's false or misleading representations, as detailed above, Aurorium is also liable for deceptive trade practices under the Delaware Deceptive Trade Practices Act ("DDTPA"), including 6 Del. C. § 2352(a)(5), (12) ("A person engages in a deceptive trade

practice when, in the course of a business, vocation, or occupation, that person: … (5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. … (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.”).

146. These false and misleading representations include, but are not limited to, the representations that Texalene 7467 has regulatory approval from the EPA under TSCA.

147. Aurorium’s advertising and promotional materials as described herein contain literally false statements regarding the nature, characteristics, benefits, uses or qualities of goods in commerce.

148. Aurorium’s advertising and promotional materials as described contain literally false representations of fact.

149. Aurorium’s advertising and promotional materials as described herein create a likelihood of confusion and misunderstanding.

150. These literally false advertising and promotional statements are material to consumer purchasing decisions, and have caused and are causing actual consumer confusion and damages to Innospec.

151. Aurorium’s false statements and advertisements violate the DDTPA and the common law of Delaware.

152. Unless this Court enjoins Aurorium from continuing to make these false claims and orders their retraction and or correction, the false advertising will continue to cause Innospec to suffer loss including sales, profits and goodwill.

153. Aurorium's false statements are willful, with malicious and deceptive intent, making this an exceptional case.

**PRAYER FOR RELIEF**

WHEREFORE, Innospec respectfully requests that the Court enter judgement as follows:

1. A declaratory judgment that Aurorium:
   a. Is in breach of the 2020 Supply Agreement;
   b. Is in breach of the 2020 Confidentiality Agreement;
   c. Is misappropriating Innospec's trade secrets under DTSA and DUTSA; and
   d. Is engaged in false advertising and unfair competition under the Lanham Act and the DDTPA.

2. A judgment that Aurorium's breaches and torts were in bad faith, willful and malicious.

3. A judgment pursuant to the DTSA, DUTSA, the Lanham Act, DDTPA, and the Court's inherent equitable powers, permanently enjoining Aurorium, its officers, directors, agents and employees and all other persons acting or attempting to act in active concert or participating with Aurorium or acting on Aurorium's behalf, from making, importing, using, selling and offering to sell Texalene 7467, or any other formulation based on or derived from Innospec's trade secrets, and from making false and misleading statements regarding regulatory approval of Texalene 7467.

4. An award of damages including compensatory monetary relief, a reasonable royalty, and/or disgorgement, and including costs, fees, pre-judgment interest and post-judgment interest for Aurorium's breaches of contract, trade secret misappropriation, false advertising and unfair competition;

5. An award of costs and reasonable attorney's fees as provided by the DTSA in 18 U.S.C. § 1836(b)(3)(D), DUTSA in 6 Del. C. § 2004, and §35(a) of the Lanham Act, 15 U.S.C. § 1117, and DDTPA in 6 Del. C. § 2533;

6. Such further and other relief as this Court deems proper and just.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Innospec demands a trial by jury of all issues raised by this Complaint that are triable by jury.

OF COUNSEL:
Matthew F. Prewitt
Sailesh K. Patel
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5583
matthew.prewitt@afslaw.com
sailesh.patel@afslaw.com

Howard J. Susser
Laura L. Carroll
Devon C. Bodey
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
(617) 973-6119
howard.susser@afslaw.com
laura.carroll@afslaw.com
devon.body@afslaw.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys Plaintiffs for Innospec Inc., and Innospec Fuel Specialties LLC*

Dated: December 16, 2024

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge except where the foregoing allegations are stated as based upon information and belief, which allegations I believe to be true upon reasonable inquiry and the information available to me.

Dated: December 15, 2024

Ian MacMillan, PhD